IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

| | |
|---|---|
| AURINIA PHARMACEUTICALS INC., and AURINIA PHARMA U.S., INC., <br><br> *Plaintiffs*, <br><br> v. <br><br> GEORGE F. TIDMARSH, <br><br> *Defendant*. | Civil Action No. 1:25-cv-3593 <br><br> JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiffs Aurinia Pharmaceuticals Inc. ("Aurinia") and Aurinia Pharma U.S., Inc. ("Aurinia US"), for their complaint against Defendant George F. Tidmarsh ("Dr. Tidmarsh"), allege as follows:

## NATURE OF THE ACTION

1.      This is an action by Plaintiffs Aurinia and Aurinia US to hold Dr. Tidmarsh accountable for false and defamatory statements he published about Plaintiffs and the voclosporin drug they developed, market, and distribute.

2.      Dr. Tidmarsh's false and defamatory statements were the products of his longstanding personal vendetta against Kevin Tang, who currently serves as Chair of the Board of Aurinia and manages Tang Capital Partners, LP ("Tang Capital"), an investment fund that is Aurinia's largest shareholder. Dr. Tidmarsh's vendetta against Mr. Tang began in 2019. In November 2019, due to growing concerns over Dr. Tidmarsh's management of La Jolla Pharmaceutical Company ("La Jolla"), Mr. Tang, in his then-capacity as Chair of the Board of La Jolla, asked Dr. Tidmarsh to resign his position as President, Chief Executive Officer ("CEO"),

and director.

3.    Around the time of the La Jolla resignation, Mr. Tang also asked Dr. Tidmarsh to resign from positions at other companies where Mr. Tang served as Chair of the Board, including American Laboratories Holdings, LLC ("American Laboratories") and Odonate Therapeutics, Inc. ("Odonate").

4.    Over the next six years, Dr. Tidmarsh repeatedly threatened that he would exact revenge against Mr. Tang over these ousters, writing in texts and emails to Mr. Tang and his business associates that he would "be exposed," that there was "[m]ore bad karma to come," that "[t]he pain is not over," and that "I'm Not powerless."

5.    After years of directly threatening retribution against Mr. Tang, Dr. Tidmarsh found himself in a position that gives him the means to carry out his threats. In July 2025, he was appointed Director of the United States Food and Drug Administration's ("FDA") Center for Drug Evaluation and Research ("CDER"). In a stunning abuse of power, and to serve his own personal interests, act on his longstanding personal grudge, and exact the revenge he repeatedly promised to inflict against Mr. Tang, Dr. Tidmarsh has targeted multiple companies affiliated with Mr. Tang and Tang Capital, including the Plaintiffs.

6.    To do so, Dr. Tidmarsh first targeted American Laboratories, one of the companies from which he was previously asked to resign. As Dr. Tidmarsh well knew, American Laboratories' top-selling product for many years has been the active pharmaceutical ingredient used to manufacture desiccated thyroid extract ("DTE") products. Dr. Tidmarsh also well knew that Mr. Tang is Chair of the Board of American Laboratories and that Tang Capital is American Laboratories' largest shareholder. DTE products (common brands include Armour Thyroid® and NP Thyroid®) have been relied on by more than one million Americans for decades as essential

medicine for a debilitating disease known as hypothyroidism.

7. Only weeks after his appointment to FDA's CDER, Dr. Tidmarsh pushed FDA to effectively remove DTE from the market. That action not only severely harmed American Laboratories' business, but also will cut off hypothyroidism patients' access to their essential medicine.

8. That is shocking enough. But it gets worse: Mere days after FDA announced it was taking action to effectively remove DTE from the market, Dr. Tidmarsh directed his personal lawyer, Joseph Galda, to email Mr. Tang and request that American Laboratories (referred to as ALI) extend a pre-existing services agreement with Dr. Tidmarsh "for another 10 years" in light of the fact "that ALI may have issues that require an extension of the services agreement"—a statement that only can be construed as referencing FDA's recent announcement that it was taking action to effectively remove DTE from the market. Under Dr. Tidmarsh's proposal, American Laboratories now would be required to make payments until the year 2044 into a Dr. Tidmarsh-associated entity. This request not only violated numerous federal laws that are designed to prevent government officials from abusing their office for private profit, but transparently reflects an attempt to extort and solicit a bribe from Mr. Tang in exchange for Dr. Tidmarsh using his power to reverse or otherwise mitigate the adverse impact on Mr. Tang, Tang Capital, and American Laboratories from FDA's recent action to effectively remove DTE from the market.

9. Mr. Tang refused to submit to this shocking abuse of power, so Dr. Tidmarsh next trained his sights on another company where Mr. Tang is Chair of the Board and where Tang Capital is the largest shareholder: Aurinia.

10. Aurinia owns the only FDA-approved voclosporin product, which it markets under the brand name LUPKYNIS®, and Aurinia US is the sole marketer and distributor of voclosporin

in the U.S.

11.     Voclosporin is an important treatment for patients suffering from lupus nephritis, a serious disease in which the immune system attacks the kidneys. Aurinia's voclosporin first was approved for marketing in the U.S. by FDA in 2021 and is now approved in 37 countries around the world, including, but not limited to, all of the countries in the European Union, Great Britain, and Japan.

12.     Despite knowing that voclosporin has demonstrated direct clinical benefit—and in total disregard of the patients suffering from lupus nephritis and benefiting from treatment with voclosporin—on the morning of September 29, 2025, Dr. Tidmarsh published a post on his personal LinkedIn page, falsely claiming that voclosporin "has not been shown to provide a direct clinical benefit for patients" and asserting that Aurinia had failed "to perform the trials necessary to confirm actual clinical benefit" from voclosporin.

13.     These statements are not only baseless, but indefensible and totally at odds with the available evidence and the conclusions of experts and regulators, including FDA, the agency for which Dr. Tidmarsh works.

14.     Voclosporin received full (not accelerated) approval from FDA based on FDA's determination that voclosporin had demonstrated direct clinical benefit in treating patients with lupus nephritis. FDA granted voclosporin full approval because—unlike drugs that receive accelerated approval based on an <u>unvalidated</u> surrogate endpoint (and therefore require confirmatory testing to show clinical benefit)—voclosporin demonstrated an improvement on a <u>validated</u> surrogate endpoint, which is an endpoint that, in FDA's own words, "is known to predict

clinical benefit"[1] based on "extensive evidence" and "extensive testing" validating such direct clinical benefit.[2] For drugs that are granted full approval, sponsors are expressly not required to perform confirmatory testing to show clinical benefit, since it is understood that clinical benefit has already been proven.

15.    In publicly available documents summarizing FDA's basis for approving voclosporin and describing voclosporin's direct clinical benefit, FDA stated, "Analysis of the efficacy data demonstrated that treatment with voclosporin induces a clinically meaningful benefit to subjects with lupus nephritis who were also treated with background MMF and corticosteroids [the standard drugs used for lupus nephritis, to which voclosporin is added for additional therapeutic benefit]."[3]

16.    Dr. Tidmarsh did not publish his statements on his personal LinkedIn account because he believed they were true, but because he wanted to continue retaliating against Mr. Tang.

17.    In a tacit admission of wrongdoing, Dr. Tidmarsh subsequently deleted the post and acknowledged he had no authorization to publish it in the first place. But the damage was done. His false statements caused Aurinia's share price to plummet more than 20% in a matter of hours, wiping out more than $350 million in market value.

18.    While Dr. Tidmarsh's false statements caused Plaintiffs substantial economic and reputational harm, his misconduct raises even larger concerns. Dr. Tidmarsh's false statements have caused and continue to cause confusion and alarm among patients and their physicians and

---

[1] FDA's Expedited Program for Serious Conditions — Accelerated Approval of Drugs and Biologics Draft Guidance for Industry (December 2024), p.7
https://www.fda.gov/media/184120/download.
[2] FDA, Surrogate Endpoint Resources for Drug and Biologic Development (July 24, 2018)
https://www.fda.gov/drugs/development-resources/surrogate-endpoint-resources-drug-and-biologic-development.
[3] LUPKYNIS FDA Multi-disciplinary Review and Evaluation, p.23
https://www.accessdata.fda.gov/drugsatfda_docs/nda/2021/213716Orig1s000MultidisciplineR.pdf.

caregivers. Since lupus nephritis is a progressive, potentially debilitating disease and treatment options are very limited, there is a real danger that interruption in treatment with voclosporin or delaying initiation of treatment with voclosporin could accelerate kidney damage and health deterioration in patients with lupus nephritis. That is a terrible price for patients to pay to allow Dr. Tidmarsh to settle a personal grudge.

19.    That someone entrusted with protecting public health would knowingly and intentionally place his own petty desire for personal vengeance above the health and safety of vulnerable patient populations is, to put it mildly, shameful. It demands a response. Plaintiffs bring this action to hold Dr. Tidmarsh accountable for his reprehensible actions, to set the record straight about voclosporin, and to recover compensatory and punitive damages.

## PARTIES

20.    Aurinia is a biopharmaceutical company focused on delivering therapies to people living with autoimmune diseases. In January 2021, Aurinia introduced voclosporin (marketed under the brand name LUPKYNIS®), the first FDA-approved oral therapy for the treatment of adult patients with active lupus nephritis. Aurinia is responsible for the research and development of voclosporin and owns the IP rights to voclosporin. Aurinia is incorporated in Alberta, Canada and has its principal place of business in Alberta.

21.    Aurinia US is a wholly-owned subsidiary of Aurinia. Aurinia US has an intercompany agreement with Aurinia whereby Aurinia US acts as the exclusive marketer and distributor of voclosporin in the U.S. on behalf of Aurinia. Aurinia US is incorporated in Delaware and has its principal place of business in Rockville, Maryland.

22.    Aurinia's only commercial product is voclosporin.

23.    On information and belief, Dr. Tidmarsh is a citizen of the State of Colorado, but currently resides in Silver Spring, Maryland, where he rents a home. In July 2025, he was

appointed as Director of FDA's CDER; on information and belief, he currently works full time at FDA's Silver Spring headquarters. Dr. Tidmarsh previously was an executive in the pharmaceutical industry.

## JURISDICTION & VENUE

24.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship among the parties and the amount in controversy exceeds $75,000, excluding interest and costs.

25.     This Court has general personal jurisdiction over Dr. Tidmarsh because he maintains continuous and systematic contacts with the State of Maryland, and his connections to Maryland are so constant and pervasive as to render him essentially at home in Maryland. Indeed, today, and at the time of the conduct at issue in this suit, on information and belief, Dr. Tidmarsh is a full-time resident of the State of Maryland who resides in Silver Spring, Maryland. Dr. Tidmarsh is also employed full-time and works on a regular basis at FDA's Silver Spring offices.

26.     This Court has specific personal jurisdiction over Dr. Tidmarsh because Plaintiffs' causes of action arise from Dr. Tidmarsh's act of having caused tortious injury in the State of Maryland by an act or omission that occurred in the State of Maryland.

27.     Venue is proper in this District because Dr. Tidmarsh resides in this District, Dr. Tidmarsh is subject to personal jurisdiction in this District, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## FACTUAL ALLEGATIONS

### Dr. Tidmarsh's history with Mr. Tang

28.     Mr. Tang manages Tang Capital, a life sciences-focused investment firm that he founded in 2002.

29.     Dr. Tidmarsh was appointed to various leadership positions at multiple

pharmaceutical companies where Mr. Tang served as Chair of the Board and where Tang Capital had significant investment holdings, including La Jolla, Odonate, and American Laboratories.

30.　　In May 2010, Tang Capital became a major shareholder of La Jolla. In January 2012, Dr. Tidmarsh was appointed President, CEO, and director of La Jolla. In August 2014, Mr. Tang was appointed Chair of the Board of La Jolla.

31.　　In March 2013, Mr. Tang founded Odonate and became its Chair of the Board and CEO. In December 2016, Dr. Tidmarsh was appointed as a director of Odonate.

32.　　In October 2015, Tang Capital acquired a majority interest in American Laboratories, and Mr. Tang and Dr. Tidmarsh were appointed as directors.

33.　　In return for his involvement in American Laboratories, Dr. Tidmarsh was granted a significant profits interest in two components (a services agreement and an equity grant) and was also paid director fees. Between 2018 and 2025, American Laboratories paid Dr. Tidmarsh more than $22.5 million.

**Mr. Tang asks Dr. Tidmarsh to resign from La Jolla and other entities**

34.　　In November 2019, due to growing concerns over Dr. Tidmarsh's management of La Jolla, Mr. Tang, in his then-capacity as Chair of the Board of La Jolla, asked Dr. Tidmarsh to resign his positions as President, CEO, and director.

35.　　Around the time of the La Jolla resignation, Mr. Tang also asked Dr. Tidmarsh to resign from positions at other companies where Mr. Tang served as Chair of the Board, including American Laboratories and Odonate.

36.　　Following his resignation, Dr. Tidmarsh retains 100 percent of his previously mentioned profits interest in American Laboratories from his services agreement and equity grant.

37.　　As a courtesy to Dr. Tidmarsh, in La Jolla's press release announcing his departure, Mr. Tang stated, "We would like to thank George for his contributions to the Company. We wish

George success in his future endeavors." [4]

**Dr. Tidmarsh undertakes a years-long campaign of threats and harassment against Mr. Tang and his business associates**

38.     Dr. Tidmarsh's response to being asked to resign was not nearly so gracious. He blamed Mr. Tang for his ouster and almost immediately commenced a years-long campaign of threatening and harassing Mr. Tang and his business associates. During that time, Dr. Tidmarsh monitored Mr. Tang and Tang Capital's investments obsessively. His antipathy to Mr. Tang intensified by the day in ways that prompted him to send scores of unhinged and threatening messages to Mr. Tang and his business associates.

39.     For example, on December 5, 2019, 12 days after Dr. Tidmarsh's resignation from La Jolla, he sent an unprompted text to Stew Kroll, who remained Chief Development Officer of La Jolla following Dr. Tidmarsh's departure and from then on reported to Mr. Tang. Dr. Tidmarsh's text to Mr. Kroll charged that Mr. Kroll had "no idea what [he] was doing," adding, "fuck you":



(*See* Exhibit 1.)

---

[4] "La Jolla Pharmaceutical Company Announces Management Transition," GlobeNewswire.com (November 25, 2019) https://perma.cc/5HB5-J2QJ.

40.    On March 27, 2020, Dr. Tidmarsh texted Mr. Tang to accuse him of having "narcissistic personality disorder," and threatened that Mr. Tang would "be exposed":



(*See* Exhibit 2.)

41.    On July 3, 2020, Dr. Tidmarsh sent Craig Johnson, a long-time business associate of Mr. Tang who currently serves as director of Aurinia, the following email regarding Heron Therapeutics, Inc. ("Heron") (referred to as HRTX) and Odonate (referred to as ODT), both companies founded by Mr. Tang and where Mr. Tang served as Chair of the Board and Mr. Johnson served as a director. The message was apparently a response to a setback (the share price dropped 28%) suffered by Heron:

**HRTX**

From: George Tidmarsh ███████████████████████
Sent: Friday, July 3, 2020 8:17 PM
To: Craig Johnson ████████████████████████████
Subject: HRTX

Have you had enough failure?  I recommend you resign ODT and take any profit. More bad karma to come.

(*See* Exhibit 3.)

42.    Then there was the following text message Dr. Tidmarsh sent Mr. Tang on July 6,

2020, apparently regarding the same setback:



    (*See* Exhibit 2.)

43.    Then, on August 25, 2020, Dr. Tidmarsh sent Mr. Johnson the following email. The

"KT" mentioned in the email's penultimate sentence is Kevin Tang:



    (*See* Exhibit 4.)

44.    On February 27, 2022, after an 18% drop in the share price of Mirati Therapeutics,

Inc. (referred to as MRTX)—another company where Mr. Johnson served as a director—Dr.

Tidmarsh sent Mr. Johnson an email warning that "[t]he pain is not over":

```
-----Original Message-----
From: George Tidmarsh
Sent: Sunday, February 27, 2022 6:31 PM
To: Craig Johnson
Subject: MRTX

The pain is not over. You should have been more thoughtful.
```

    (*See* Exhibit 5.)

45.    And on March 6, 2024, Dr. Tidmarsh sent Mr. Kroll, now Chief Development Officer of Tang Capital, a message on his personal LinkedIn account regarding a setback with an investigational DTE product (referred to as ST-1891) being developed by American Laboratories, touting his connections to FDA, and forecasting the demise of another Tang Capital holding, Jounce Therapeutics, Inc.:



(*See* Exhibit 6.)

46.    The above examples are purely illustrative. They are far from an exhaustive compilation of the many bitter, bizarre, and threatening messages Dr. Tidmarsh has sent to Mr. Tang and his business associates since 2019.

**In the months leading up to his appointment to FDA, Dr. Tidmarsh's threats became increasingly aggressive**

47.    On November 27, 2024, Dr. Tidmarsh sent yet another threatening message to Mr. Tang. In this one, he complained that he was not receiving payments from his equity grant from American Laboratories. He closed the email ominously, telling Mr. Tang he was "hopeful we can keep this amicable." Between 2018 and 2025, American Laboratories paid Dr. Tidmarsh more than $22.5 million.

48.    On November 29, 2024, Dr. Tidmarsh re-sent his November 27 email, threatening that he was "sending this one last time before we end up in a negative situation":



(*See* Exhibit 7.)

49.    The following day—eight months before Dr. Tidmarsh was appointed Director of FDA's CDER—Dr. Tidmarsh precipitated the "negative situation" he had threatened. On LinkedIn, he announced that he was "[w]orking with the new FDA to remove [DTE] permanently from the market":



(*See* Exhibit 8.)

50.    Dr. Tidmarsh emailed Mr. Tang a link to the post, with no further text, menacingly titling his email "Good Luck":



(*See* Exhibit 9.)

51.     Days later, on December 10, 2024, Dr. Tidmarsh followed up with another email to Mr. Tang, this one titled "What in the world is wrong with you?" In the email, Dr. Tidmarsh assailed Mr. Tang for not communicating with him, before threatening, "I'm Not powerless":



(*See* Exhibit 10.)

52.     At the time, Mr. Tang was unsure what power Dr. Tidmarsh was referencing. He soon found out.

**Dr. Tidmarsh assumes leadership of FDA's CDER and immediately sets out to harm Mr. Tang's business interests and extort and solicit a bribe from Mr. Tang**

53.    On July 21, 2025, Dr. Tidmarsh was appointed Director of FDA's CDER, which is responsible for reviewing, approving, and regulating most prescription and over-the-counter drugs marketed in the U.S., and, where necessary, removing or otherwise restricting the marketing of such drugs.

54.    On July 31, 2025, Dr. Tidmarsh's personal lawyer, Joseph Galda, emailed Mr. Tang about Dr. Tidmarsh's services agreement with American Laboratories (referred to as ALI). After explaining that Dr. Tidmarsh was legally required to divest himself of any interest in American Laboratories, Mr. Galda's email stated: "[Dr. Tidmarsh's] services having been completed, he has assigned the right to receive payments [to] Virello Group, LLC, which is a limited liability company managed by me for the benefit of each of his three sons." Mr. Galda then asked that future payments under Dr. Tidmarsh's services agreement be sent to him. The following day, Dr. Tidmarsh emailed Mr. Tang to confirm the instructions in Mr. Galda's July 31, 2025 email.



Re: Dr. Tidmarsh and ALI

From George Tidmarsh
Date Fri 8/1/2025 4:17 AM
To Joseph P. Galda
Cc Kevin Tang            ; Joseph P. Galda

Thank you JP. I can confirm these instructions

On Jul 31, 2025, at 21:19, Joseph P. Galda                wrote:

Mr. Tang:  Sorry for the typo.  I meant in care of.

Best,

JPG

**JOSEPH P. GALDA**
J.P. Galda & Co.
40 East Montgomery Avenue, LTW 220
Ardmore , PA 19003

M:+
E:

**From:** Joseph P. Galda
**Date:** Thursday, July 31, 2025 at 4:54 PM
**To:** kevin
**Cc:** George F. Tidmarsh, M.D. Ph.D.
**Subject:** Dr. Tidmarsh and ALI

Mr. Tang:

As I'm sure you know, Dr. Tidmarsh has begun his duties at the Food and Drug
Administration which require his divestiture of all interests in pharmaceutical and
biotechnology companies and in that connection his right to receive payment under the
services agreement with a ALI. His services having been completed, he has assigned the
right to receive payments Virello Group, LLC, which is a limited liability company managed
by me for the benefit of each of his three sons. Please direct payments to not care of J.P.
Galda & Co., 40 E. Montgomery Ave., LTW 220, Ardmore, PA 19003. Recognizing the need
to assure you that this is his instruction, I am asking him to return confirmation to this email.

Should have any question in this regard, please call me at                .

Kind regards,

JPG

(*See* Exhibit 11.)

55.    Given his new position, Dr. Tidmarsh should have been focused on advancing

public health and wellbeing. Instead, he immediately set out abusing his position to harm

16

Mr. Tang's business interests and extort and solicit a bribe from Mr. Tang.

56.    On August 7, 2025, just as Dr. Tidmarsh had previously threatened, and less than a month after his appointment to FDA's CDER, FDA announced it was taking actions to effectively remove DTE from the market. Not coincidentally, this announcement had a direct negative impact on American Laboratories, whose top-selling product for many years has been the active pharmaceutical ingredient used to manufacture DTE products.

57.    Dr. Tidmarsh's actions to push FDA to effectively remove DTE from the market were transparently undertaken to punish Mr. Tang. These actions reflected a disturbing callousness toward the more than one million Americans who have relied on DTE products to treat hypothyroidism for decades.

58.    FDA's announcement of the impending removal of DTE from the market portends devastating consequences for patients. This announcement has led to wide-reaching backlash from patients, physicians, caregivers, advocacy groups, and members of Congress, including three Congressional letters and multiple petitions on Change.org that have generated more than 65,000 signatures to date.

59.    But that was no concern to Dr. Tidmarsh, whose goal was to exact revenge against Mr. Tang. As Dr. Tidmarsh well knew: American Laboratories' top-selling product for many years has been the active pharmaceutical ingredient used to manufacture DTE products; Mr. Tang is Chair of the Board of American Laboratories; Tang Capital is American Laboratories' largest shareholder; and pushing FDA to effectively remove DTE from the market would impose enormous losses on American Laboratories and therefore on Mr. Tang and Tang Capital.

60.    Dr. Tidmarsh was not content to stop there, though. Having pushed FDA to effectively remove DTE from the market and threatened the viability of American Laboratories,

Dr. Tidmarsh immediately set out to profit personally from those actions by demanding payment

from Mr. Tang.

61.    Days after FDA's announcement, Dr. Tidmarsh directed his personal lawyer, Mr.

Galda, to email Mr. Tang and request that American Laboratories (referred to as ALI) extend a

pre-existing services agreement with Dr. Tidmarsh "for another 10 years" in light of the fact "that

ALI may have issues that require an extension of the services agreement"—a statement that only

can be construed as referencing FDA's recent announcement that it was taking action to effectively

remove DTE from the market. Under Dr. Tidmarsh's proposal, American Laboratories now would

be required to make payments until the year 2044 into a Dr. Tidmarsh-associated entity. This

August 28, 2025 email from Mr. Galda to Mr. Tang, titled "Agreement with Dr. Tidmarsh," reads

as follows:

---

**Agreement with Dr. Tidmarsh**

**From** Joseph P. Galda ███████████████████████

**Date** Thu 8/28/2025 12:08 PM

**To**    Kevin Tang : ████████████████████████

Kevin:

I hope this finds you well. It is my understanding that ALI may have issues that require an extension of
the services agreement. Accordingly, we propose to extend the services agreement for another 10
years.. Please let me know if this is acceptable and if so, I will prepare the associated paperwork.

Best,

JPG

---

(*See* Exhibit 12.)

62.    The import of Mr. Galda's unsolicited and unprovoked email could not have been

clearer: Dr. Tidmarsh wanted a payout in exchange for using his authority as CDER Director to

help mitigate the obvious harm to American Laboratories, Tang Capital, and Mr. Tang from the

effect of FDA's recent decision to effectively remove DTE from the market. This request not only violated numerous federal laws that are designed to prevent government officials from abusing their office for private profit, but transparently reflects an attempt to extort and solicit a bribe from Mr. Tang in exchange for Dr. Tidmarsh using his power to reverse or otherwise mitigate the adverse impact on Mr. Tang, Tang Capital, and American Laboratories from FDA's recent action to effectively remove DTE from the market.

63.    Mr. Tang refused to submit to this shocking abuse of power. After receipt of Mr. Galda's August 28, 2025 email, Mr. Tang contacted law enforcement officials through legal counsel to explore the possibility of a criminal referral for extortion and began working with a former Federal Bureau of Investigation special agent in an effort to capture further communications with Dr. Tidmarsh. In the hope that Dr. Tidmarsh and his lawyer might further incriminate themselves, Mr. Tang responded to Mr. Galda's email on September 4, 2025 by asking Mr. Galda to clarify precisely "what issues [Dr. Tidmarsh] can help with." Mr. Galda did not immediately respond.

64.    Then, on October 31, 2025—nearly two months later, and on the eve of the filing of this lawsuit—Mr. Galda responded to Mr. Tang's email, saying that "to be clear," Dr. Tidmarsh could not provide any assistance "in his capacity with the FDA." Mr. Galda then accused Mr. Tang of inappropriately "soliciting" Dr. Tidmarsh's assistance with American Laboratories and threatened that this might "require a referral to the appropriate authorities."

| | |
|---|---|
| **From:** | Joseph P. Galda |
| **To:** | Kevin Tang |
| **Subject:** | Re: Agreement with Dr. Tidmarsh |
| **Date:** | Friday, October 31, 2025 11:33:54 AM |

Kevin: Just to be clear, in his capacity with the FDA George cannot provide any assistance. To the extent that this email is soliciting assistance in is governmental capacity, this is highly inappropriate and would require a referral to the appropriate authorities.

JPG

(*See* Exhibit 13.)

65.     Of course, this accusation is patently absurd, since it was Dr. Tidmarsh, via Mr. Galda, who proactively initiated contact with Mr. Tang and sent the unsolicited and unprovoked email to Mr. Tang on August 28, 2025 demanding a payoff in exchange for Dr. Tidmarsh's assistance with American Laboratories' "issues." Given its timing, Mr. Galda's belated email can only be seen as Dr. Tidmarsh's effort to try to cover his tracks.

**Dr. Tidmarsh's next target: Aurinia and voclosporin**

66.     Rather than putting an end to Dr. Tidmarsh's quest for vengeance, Mr. Tang's refusal to pay off Dr. Tidmarsh only deepened Dr. Tidmarsh's desire for retribution. Within weeks of Mr. Galda's email, Dr. Tidmarsh next turned his sights toward another company where Mr. Tang is Chair of the Board and where Tang Capital is publicly known to be the largest shareholder: Aurinia.

67.     Aurinia owns the only FDA-approved voclosporin product, and Aurinia US is the sole marketer and distributor of voclosporin in the U.S.

68.     Aurinia's only commercial product is voclosporin.

69.     Voclosporin is an important treatment for patients suffering from lupus nephritis, a serious disease in which the immune system attacks the kidneys. Aurinia's voclosporin first was

approved for marketing in the U.S. by FDA in 2021 and is now approved in 37 countries around the world, including, but not limited to, all of the countries in the European Union, Great Britain, and Japan.

**Dr. Tidmarsh published false and damaging statements that he knew were false at the time he made them**

70.     Despite knowing that voclosporin has demonstrated direct clinical benefit—and in total disregard of the patients suffering from lupus nephritis and benefiting from treatment with voclosporin—on the morning of September 29, 2025, Dr. Tidmarsh published a post on his personal LinkedIn page, falsely claiming that voclosporin "has not been shown to provide a direct clinical benefit for patients" and asserting that Aurinia had failed "to perform the trials necessary to confirm actual clinical benefit" from voclosporin:



(*See* Exhibit 14.)

71.     The post clearly referred to Plaintiffs, as Aurinia owns the only FDA-approved voclosporin product and Aurinia US is the sole marketer and distributor of voclosporin in the U.S.

Indeed, numerous news articles, online reports, and comments about Dr. Tidmarsh's post immediately identified it as being targeted directly at Aurinia.[5]

72.    A social media post by an FDA official criticizing a specific drug, particularly an already FDA-approved drug, is highly unusual. As biopharmaceutical industry publication *STAT* reported, "[i]t's highly unusual, if not unheard of, for a top FDA official to use a personal social media account to criticize a specific drug, particularly without providing evidence to back up such a claim." (*See* Exhibit 15.)

73.    Dr. Tidmarsh's statements that voclosporin "has not been shown to provide a direct clinical benefit for patients" and that Aurinia has failed "to perform the trials necessary to confirm actual clinical benefit" are not only baseless, but indefensible and totally at odds with the available evidence and the conclusions of experts and regulators, including FDA, the agency for which Dr. Tidmarsh works.

74.    FDA's own approval (and for that matter the approval by the regulatory agencies of 36 other countries around the world) of Aurinia's drug is, itself, testament to the falsity of Dr. Tidmarsh's statements.

75.    Voclosporin received full (not accelerated) approval from FDA based on FDA's determination that voclosporin had demonstrated direct clinical benefit in treating patients with lupus nephritis. FDA granted voclosporin full approval because—unlike drugs that receive accelerated approval based on an <u>unvalidated</u> surrogate endpoint (and therefore require

---

[5] *See, e.g.*, "FDA official challenges safety, efficacy of Aurinia lupus med in now-deleted LinkedIn post targeting surrogate endpoints," FiercePharma.com (September 30, 2025), https://www.fiercepharma.com/pharma/fdas-cder-chief-challenges-safety-efficacy-aurinias-lupus-med-deleted-linkedin-post; "Aurinia Sinks After FDA Official Questions Its Drug in Post," Bloomberg.com (September 29, 2025), https://www.bloomberg.com/news/articles/2025-09-29/aurinia-sinks-after-fda-official-questions-its-drug-on-linkedin?embedded-checkout=true; "FDA Director Criticizes Lupus Nephritis Drug Lupkynis, Questions Surrogate Endpoint Approvals," MedPath.com (September 30, 2025), https://trial.medpath.com/news/063e980cc20cc79f/fda-director-criticizes-lupus-nephritis-drug-lupkynis-questions-surrogate-endpoint-approvals.

confirmatory testing to show clinical benefit)—voclosporin demonstrated an improvement on a <u>validated</u> surrogate endpoint, which is an endpoint that, in FDA's own words, "is known to predict clinical benefit"[6] based on "extensive evidence" and "extensive testing" validating such direct clinical benefit.[7] For drugs that are granted full approval, sponsors are expressly not required to perform confirmatory testing to show clinical benefit, since it is understood that clinical benefit has already been proven.

76.      In publicly available documents summarizing FDA's basis for approving voclosporin and describing voclosporin's direct clinical benefit, FDA stated, "Analysis of the efficacy data demonstrated that treatment with voclosporin induces a clinically meaningful benefit to subjects with lupus nephritis who were also treated with background MMF and corticosteroids [these are the standard drugs used for lupus nephritis to which voclosporin is added for additional therapeutic benefit]."[8]

77.      FDA is not alone in having recognized the direct clinical benefit that voclosporin provides to lupus nephritis patients. In publicly available documents on its website supporting voclosporin's 2022 approval in the European Union, the European Union's European Medicines Agency states that "Lupkynis [the brand name for voclosporin] was shown to be more effective than placebo (a dummy treatment) in achieving stable kidney function in adults with active lupus nephritis." Achievement of stable kidney function in patients with lupus nephritis is a direct clinical benefit; indeed, it is the entire goal of treatment.

78.      In April 2024, FDA approved a supplemental new drug application ("sNDA") for

---

[6] FDA's Expedited Program for Serious Conditions — Accelerated Approval of Drugs and Biologics Draft Guidance for Industry (December 2024), p.7 https://www.fda.gov/media/184120/download.
[7] FDA, Surrogate Endpoint Resources for Drug and Biologic Development (July 24, 2018) https://www.fda.gov/drugs/development-resources/surrogate-endpoint-resources-drug-and-biologic-development.
[8] LUPKYNIS FDA Multi-disciplinary Review and Evaluation, p.23 https://www.accessdata.fda.gov/drugsatfda_docs/nda/2021/213716Orig1s000MultidisciplineR.pdf.

voclosporin. The sNDA approval, which was based on clinical studies in which patients were treated with voclosporin for three years, resulted in the addition of long-term efficacy and safety data to support the use of voclosporin beyond one year. The safety profile of voclosporin in the updated label remained unchanged.

79.    The 2024 American College of Rheumatology Guideline for the Screening, Treatment, and Management of Lupus Nephritis recommends triple immunosuppressive therapy, including treatment with a calcineurin inhibitor ("CNI") (the class of drugs that include voclosporin) as first-line therapy for patients with lupus nephritis. Voclosporin is the only CNI that is FDA approved for the treatment of lupus nephritis. The American College of Rheumatology is a leading organization of physicians and scientists dedicated to the advancement of care for patients suffering from inflammatory diseases such as lupus nephritis.

80.    Since its approval, voclosporin, which is the only FDA-approved oral treatment for lupus nephritis and the only FDA-approved therapy that has demonstrated a statistically significant improvement in complete renal response after only six months of treatment, has emerged as a mainstay treatment for this serious disease.

81.    As Director of FDA's CDER, Dr. Tidmarsh was personally aware that voclosporin received full approval based on a validated surrogate endpoint, well understood the differences between validated and unvalidated surrogate endpoints, and knew of the voluminous evidence refuting his false statements, including, but not limited to, evidence described and relied on by the agency for which Dr. Tidmarsh works.

82.    Dr. Tidmarsh did not publish his statements on his personal LinkedIn account because he believed they were true, but because he wanted to continue retaliating against Mr. Tang.

**Dr. Tidmarsh's false statements caused and continue to cause enormous harm**

83.    Dr. Tidmarsh's plan worked. His false statements caused Aurinia's share price to

24

plummet more than 20% in a matter of hours, wiping out more than $350 million in market value.

84.    While Dr. Tidmarsh's false statements caused Plaintiffs substantial economic and reputational harm, his misconduct raises even larger concerns. Dr. Tidmarsh's false statements have caused and continue to cause confusion and alarm among patients and their physicians and caregivers. Since lupus nephritis is a progressive, potentially debilitating disease and treatment options are very limited, there is a real danger that interruption in treatment with voclosporin or delaying initiation of treatment with voclosporin could accelerate kidney damage and health deterioration in patients with lupus nephritis. That is a terrible price for patients to pay to allow Dr. Tidmarsh to settle a personal grudge.

85.    Following Dr. Tidmarsh's false statements, numerous physicians, citing Dr. Tidmarsh's post, have raised concerns about voclosporin with Aurinia's medical staff.

86.    That someone entrusted with protecting public health would knowingly and intentionally place his own petty desire for personal vengeance above the health and safety of vulnerable patient populations is, to put it mildly, shameful. It demands a response. Plaintiffs bring this action to hold Dr. Tidmarsh accountable for his reprehensible actions, to set the record straight about voclosporin, and to recover compensatory and punitive damages.

**Dr. Tidmarsh was not acting within the scope of his official duties when he published his defamatory statements**

87.    When he published his defamatory September 29, 2025 LinkedIn post, Dr. Tidmarsh was not acting within the scope of his office or employment.

88.    Dr. Tidmarsh published the post on his personal LinkedIn account. On information and belief, Dr. Tidmarsh did not have authority or approval from his superiors at FDA to publish the post.

89.    On information and belief, Dr. Tidmarsh's post violated FDA's own policies and

procedures for employees' issuance of public statements and use of social media.

90.     After publishing and then removing the original post, Dr. Tidmarsh published a

follow-up post in which he stated that the original post was not made within the scope of his office

or employment but rather reflected only his "own personal views," not those of FDA or the

Department of Health and Human Services (referred to as HHS), and that "[a]ll official guidance

or comments from the Agency or Department are made through official channels," not through

personal LinkedIn accounts:



(*See* Exhibit 16.)

91.     Underscoring that Dr. Tidmarsh's post was unauthorized and improper, numerous

industry observers commented on how unprecedented and unusual it was. For example,

biopharmaceutical industry publication *STAT* commented that "[i]t's highly unusual, if not

unheard of, for a top FDA official to use a personal social media account to criticize a specific

drug, particularly without providing evidence to back up such a claim." (*See* Exhibit 13.)

92.     Similarly, industry publication *Fierce Pharma* observed, "[t]he use of a personal

social media account by an FDA official as a bully pulpit to go after a specific drug is highly

unusual, if not unheard of."[9]

93.    *GeneOnline* also commented on the post's "unusual nature," noting that "FDA officials typically refrain from publicly commenting on individual therapies."[10]

94.    Additionally, as set forth in detail above, Dr. Tidmarsh's original post was not motivated by a desire to serve the purposes of FDA or to further FDA official business. Instead, the post was motivated by a desire to retaliate against Mr. Tang and harm Aurinia, the company of which Mr. Tang is Chair of the Board and Tang Capital is the largest shareholder.

95.    Indeed, some sophisticated industry observers familiar with Dr. Tidmarsh's history with Mr. Tang were immediately suspicious of Dr. Tidmarsh's motives, particularly given how unusual and unprecedented his post was. Biopharmaceutical industry publication *STAT* opened its story on the post by asking, "[i]s George Tidmarsh, the Food and Drug Administration's top regulator, trying to exact revenge on a prominent Wall Street investor after a run-in with him six years ago?" *STAT* further reported that this was "the question biotech investors were wagging about all Monday after Tidmarsh used his personal LinkedIn page to raise questions about the safety of voclosporin, a rather obscure drug the FDA approved in 2021 to treat patients with lupus nephritis…." (*See* Exhibit 13.)

**Plaintiffs bring this action to hold Dr. Tidmarsh accountable for his reprehensible conduct**

96.    Aurinia exists to help patients suffering from autoimmune diseases.

97.    Aurinia's only commercial product is voclosporin, which is an important treatment

---

[9] "FDA official challenges safety, efficacy of Aurinia lupus med in now-deleted LinkedIn post targeting surrogate endpoints," FiercePharma.com (September 30, 2025) https://www.fiercepharma.com/pharma/fdas-cder-chief-challenges-safety-efficacy-aurinias-lupus-med-deleted-linkedin-post.
[10] "FDA Official George Tidmarsh Criticizes Aurinia Pharmaceuticals Therapy in Rare Public Comment," GeneOnline.com (September 29, 2025) https://www.geneonline.com/fda-official-george-tidmarsh-criticizes-aurinia-pharmaceuticals-therapy-in-rare-public-comment/.

for patients suffering from lupus nephritis. Voclosporin is also the only product Aurinia US markets and distributes.

98.     When Aurinia and Aurinia US found themselves in Dr. Tidmarsh's crosshairs, all because of their association with Mr. Tang, it was surprising and unsettling. No one at Aurinia or Aurinia US ever anticipated that the companies' work to improve patients' lives could become collateral damage in Dr. Tidmarsh's bizarre personal vendetta against Mr. Tang.

99.     So, on October 17, 2025, Aurinia and Aurinia US' CEO, Peter Greenleaf, reached out personally to Dr. Tidmarsh, asking him to retract his false and damaging statements.

100.     In the email, Mr. Greenleaf emphasized the evidence showing the statements were not just unfounded, but outright false, described the harm that his statements were causing to the Company, patients, and their caregivers, and expressly requested that Dr. Tidmarsh make a public statement that his prior statements regarding voclosporin were false, misleading, and baseless.

101.     Dr. Tidmarsh did not respond to Mr. Greenleaf's request.

102.     To hold Dr. Tidmarsh accountable for his reprehensible actions, to set the record straight about voclosporin, and to recover compensatory and punitive damages, Plaintiffs bring this action.

## **FIRST CLAIM FOR RELIEF**

## **DEFAMATION FOR STATEMENTS IN THE SEPTEMBER 29, 2025 LINKEDIN POST**

103.     Plaintiffs repeat, reallege, and incorporate the above paragraphs as though fully set forth herein.

104.     On September 29, 2025, Dr. Tidmarsh published a post on his personal LinkedIn account.

105.     The post stated: "So we have approved drugs with significant toxicity like vocolosporin [sic] that has not been shown to provide a direct clinical benefit for patients."

106.    The post further communicated that Aurinia had failed "to perform the trials necessary to confirm actual clinical benefit."

107.    The post was published to a worldwide audience on LinkedIn's platform.

108.    The post was of and concerning Aurinia and Aurinia US. Readers understood the post to concern Plaintiffs' voclosporin pharmaceutical product, which is owned by Aurinia and marketed and distributed in the U.S. exclusively by Aurinia US.

109.    The post was intended to convey, and was understood by readers of ordinary intelligence as conveying, the factual accusation that voclosporin "has not been shown to provide a direct clinical benefit for patients" and that Aurinia had failed "to perform the trials necessary to confirm actual clinical benefit" from voclosporin.

110.    The post is false and defamatory.

111.    The post is libelous per se in that it tends to prejudice Aurinia and Aurinia US in the conduct of their trade and business.

112.    By publishing the post, Dr. Tidmarsh caused harm to Plaintiffs' reputation.

113.    By publishing the post, Dr. Tidmarsh caused investors, patients, physicians, caregivers, and members of the public to spurn Plaintiffs and their voclosporin product, including costing Aurinia more than $350 million in lost market value.

114.    Dr. Tidmarsh published the post with actual malice, in that he was aware at the time of publication that the statement was false or, at a minimum, had a high degree of awareness that the statement was probably false.

115.    Dr. Tidmarsh's conduct was willful, malicious, intentional, wanton, and/or reckless, entitling Plaintiffs to punitive damages.

116.    As a direct and proximate result of the publication of the false and defamatory

September 29, 2025 post, Plaintiffs have suffered damages, including economic and reputational damages, in an amount to be determined at trial.

**SECOND CLAIM FOR RELIEF**

**INJURIOUS FALSEHOOD FOR STATEMENTS IN THE SEPTEMBER 29, 2025 LINKEDIN POST**

117.    Plaintiffs repeat, reallege, and incorporate the above paragraphs as though fully set forth herein.

118.    On September 29, 2025, Dr. Tidmarsh published a post on his personal LinkedIn account.

119.    The post stated: "So we have approved drugs with significant toxicity like vocolosporin [sic] that has not been shown to provide a direct clinical benefit for patients."

120.    The post further communicated that Aurinia had failed "to perform the trials necessary to confirm actual clinical benefit."

121.    The post was published to a worldwide audience on LinkedIn's platform.

122.    The post was of and concerning Aurinia and Aurinia US. Readers understood the post to concern Plaintiffs' voclosporin pharmaceutical product, which is owned by Aurinia and marketed and distributed in the U.S. exclusively by Aurinia US.

123.    The post was intended to convey, and was understood by readers of ordinary intelligence as conveying, the factual accusation that voclosporin "has not been shown to provide a direct clinical benefit for patients" and that Aurinia had failed "to perform the trials necessary to confirm actual clinical benefit" from voclosporin.

124.    The post was intended to, and in fact did, negatively affect the value of Plaintiffs' interests in their voclosporin drug, as reflected by, among other things, a drop of more than $350 million in the market value of Aurinia, whose sole commercial product is voclosporin.

125.    Dr. Tidmarsh published the post with actual malice, in that he was aware at the time of publication that the statement was false or, at a minimum, had a high degree of awareness that the statement was probably false.

126.    In publishing the post, Dr. Tidmarsh was motivated by ill-will toward Plaintiffs because of their association with Mr. Tang.

127.    Dr. Tidmarsh's conduct was willful, malicious, intentional, wanton, and/or reckless, entitling Plaintiffs to punitive damages.

128.    As a direct and proximate result of Dr. Tidmarsh publishing the false and defamatory September 29, 2025 post, Plaintiffs have suffered damages, including economic and reputational damages, in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court award them relief against Defendant as follows:

129.    Actual, presumed, and compensatory damages in excess of $75,000, as well as interest, reasonable attorneys' fees, and costs, as allowed by law;

130.    Punitive damages, as allowed by law; and

131.    Such other and further relief as the Court deems appropriate.

## JURY TRIAL DEMAND

Plaintiffs demand trial by jury for all claims and issues that are so triable.

Date:  November 2, 2025

*/s/ Joseph L. Meadows*
Joseph L. Meadows (Bar No. 15856)
GORDON REES SCULLY MANSUKHANI, LLP
277 S. Washington Street, Suite 550
Alexandria, VA 22314
T: 202-399-1009
F: 202-800-2999
Email: jmeadows@grsm.com

Andrew C. Phillips (*Pro Hac Vice Forthcoming*)
Megan Meier (*Pro Hac Vice Forthcoming*)
Mark Thomson (*Pro Hac Vice Forthcoming*)
MEIER WATKINS PHILLIPS PUSCH LLP
1120 20th St, NW, Suite 550
Washington, DC 20036
Email: andy.phillips@mwpp.com
Email: megan.meier@mwpp.com
Email: mark.thomson@mwpp.com

*Counsel for Plaintiffs Aurinia Pharmaceuticals Inc.
and Aurinia Pharma U.S., Inc.*